UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ZACHARY A. CHESSER,

    Plaintiff,

    v.

DIRECTOR, FEDERAL
BUREAU OF PRISONS, in
his official capacity;

    Defendant.

Case: 1:14-cv-02161
Assigned To : Hogan, Thomas F.
Assign. Date : 12/22/2014
Description: Pro Se Gen. Civil

## Complaint for Declaratory and Injunctive Relief

### Introduction

1. Plaintiff Zachary A. Chesser, also known as Abu Talhah Al-Amriki, is a prisoner in United States Penitentiary Florence, Colorado's Administrative Maximum Facility ("ADX") which is part of the Federal Bureau of Prisons (BOP). Mr. Chesser is a Muslim and many tenets of Islam require group religious activity. Despite this, the BOP prohibits all religious gatherings outside of weekly authorized services, which are insufficient to fulfill Islam's religious obligations. This policy imposes a substantial, and unjustified, burden on the religious exercise of Mr. Chesser and violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1.

2. Mr. Chesser requests the issuance of appropriate injunctive and declaratory relief.

### Jurisdiction, venue, cause of action

3. This Court has jurisdiction of this cause pursuant to 28 U.S.C. § 1331.

RECEIVED

NOV 25 2014

Clerk, U.S. District and
Bankruptcy Courts



RECEIVED
Mail Room

NOV 24 2014

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

1

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

5. Declaratory relief is authorized by 28 U.S.C. § 2201, 2202 and by Rule 57 of the Federal Rules of Civil Procedure.

6. This action is brought pursuant to RFRA, 42 U.S.C. § 2000bb-1(c).

## Parties

7. Zachary A. Chesser is an adult person currently confined at ADX.

8. The Director of the Federal Bureau of Prisons is the duly appointed head of the agency and is sued pursuant to Rule 17(d) of the Federal Rules of Civil Procedure.

## Factual Background

### The Policy

9. The BOP's Program Statement P5360.09, entitled Religious Beliefs and Practices states, at page 3, "Authorized congregate services will be made available for all inmates weekly with the exception of those detained in any Special Housing Units (SHUs)."

10. All other religious gatherings of two or more inmates are "Unauthorized." Inmates found in "unauthorized gatherings" are able to be subjected to discipline.

11. Islam obligates and encourages a variety of religious gatherings such as five-times-daily group prayer, religious classes and various event-related prayers such as an "eclipse prayer."

12. Mr. Chesser sincerely believes in the status Islam assigns

these practices.

13. From 2011 to 2012, Mr. Chesser received four incident reports for suspected violations of this policy. Exhibit A.

14. These incident reports formed a substantial part of the basis for his transfer to ADX in June, 2014. Id.

15. The conditions at ADX render most of these activities physically impossible.

16. The BOP allows gatherings for non-religious purposes.

17. Inmates can converse, eat together, play sports, play table games and engage in other similar group activity.

18. However, if the activity is religious, it is prohibited, such as when two inmates pray together.

19. There is no greater danger inherent in a religious gathering not also present in a non-religious gathering.

20. The policy of the Director of the federal Bureau of Prisons that prohibits unauthorized religious gatherings imposes a substantial burden on the Plaintiff's religious exercise.

21. This policy is not narrowly tailored to promote a compelling governmental interest.

Grievances

22. Plaintiff has fully exhausted his administrative remedies without defendant altering its policy. Exhibit A.[1]

[1] "Exhibit A" as referenced in the remedy is around seventy pages, most of which do not deal with religious issues, so it has been removed for brevity. The Plaintiff has exhausted this issue numerous times and some other examples:

*Irreparable Harm*

23.  Plaintiff Zachary Chesser is being caused irreparable harm for which there is no adequate remedy at law.

## Legal Claim

24.  The policy of defendant Director, Federal BOP, of prohibiting religious gatherings imposes a substantial burden on the plaintiff's religious exercise and neither furthers a compelling governmental interest, nor is it the least restrictive means to further that interest. It is therefore unlawful as violating the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1.

## Request for Relief

WHEREFORE, plaintiff requests that this Court:

1.  Accept jurisdiction of this case and set it for hearing at the earliest opportunity.

2.  Declare that the defendant has violated federal law for the reasons noted above.

3.  Enter a temporary restraining order or preliminary injunction, later to be made permanent, enjoining the defendant from imposing greater restrictions on religious gatherings than on non-religious gatherings.

4.  Award all other proper relief.

---

can be found in *Chesser v. Walton, et al.*, #3:12-cv-1198-JPG-PMF, Doc. 19 Ex. 3; *Chesser v. Rivas, et al.*, #3:13-cv-456-JPG-PMF, Doc. 1 Ex. B (religious classes); and the removed "Exhibit A" of Exhibit A to this complaint can be found at Doc. 84 Ex. 2 of *Chesser v. Walton, et al.* and Exhibit H of the Plaintiff's Motion for a Temporary Restraining order and Preliminary Injunction.

Verification

I, Zachary A. Chesser, hereby state the foregoing to be true under penalty of perjury.

RESPECTFULLY SUBMITTED,

Zachary A. Chesser, pose
Reg. No. 76715-083
U.S. Penitentiary; ADX
P.O. Box 8500
Florence, CO 81226-8500

Exhibit   A

Regional Administrative Remedy Appeal

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Chesser, Zachary A.          76715-083          I          USP Marion
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

Part A - REASON FOR APPEAL This is an appeal of my ADX General Regulation Decision. First, I appeal this on every ground raised in my written statement which I submitted at my hearing which is attached as Exhibit A. Second, in addition to violating RFRA as mentioned in Exhibit A, the fact that my engagement in congregational prayer is being used against me means that any ruling enjoining the conduct described in my lawsuit Chesser v. Walton, which seeks an enjoinment of the ban on congregational prayer, will mean my transfer to ADX is illegal. F. Franle, the hearing administrator, said my engagement in congregational prayer represented 1/2 of the basis for my recommendation. Also, all of my 315/316 incident reports, which represent 4/7 of the incident reports used against me, have to do with group prayer. I am currently waiting on a preliminary injunction in Chesser v. Walton. If that ruling is granted, it would encompass my ADX transfer. At that point, the BOP (Charles Samuel is a defendant) will have to return me to a CMU general population or be in contempt of court. For more information, you can contact my lawyer Dale Aschemann at (618) 988-0022 or DaleA@guitarlaw.org. Third, a Senate Report was used against me without it being disclosed to me and without my being provided any information as to how it was being used. This report is a public document and failing to disclose to me this information violates my procedural due process rights. Also, I believe that its use is retaliatory for my criticism of CMU staff and BOP staff in charge of ADX Referrals which can be [bound in the above and in the] report. I even have a suit on this very subject Chesser v. Rivas. As outlined [policy, because there] are 5/9/14 attached documents, my transfer is illegal and also violates [BOP] other facilities able to house me. Thus it should be reversed.

DATE                                                      SIGNATURE OF REQUESTER

Part B - RESPONSE

DATE
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                          REGIONAL DIRECTOR

                                                    CASE NUMBER: 780153-R1

Part C - RECEIPT
                                                    CASE NUMBER: 780153-R1

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION
SUBJECT: _____

          DATE                              SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN          PRINTED ON RECYCLED PAPER                          BP-230(13)
                                                                   JUNE 2002

Administrative Remedy Number 780153-R1
Part B - Response

This is in response to your Administrative Remedy Appeal, wherein
you contest being designated to the general population of the
Administrative Maximum Penitentiary (ADX) in Florence, Colorado.
You contend that the decision was retaliatory, illegal, and violates
Bureau of Prisons (Bureau) policy.  First, you claim that your rights
to participate in congregational prayer and the consequential incident
reports were in direct violation of the Religious Freedom Restoration
Act.  Second, you indicate that a senate report was used against you
without being disclosed to you.  You claim this is a violation of
your procedural due process rights.  You believe that the use of this
report was retaliatory for your criticism of Communication Management
Unit (CMU) staff and Bureau staff in charge of ADX referrals.  Third,
you oppose the opinion that your conduct creates a risk to
institutional security and good order; hence, surmising that you
cannot be safely housed in the general population of a regular
correctional facility.  Thereby, you assert that your transfer to the
ADX is illegal, and violates Bureau policy, because there are other
facilities able to house you.  You request review and reversal of the
ADX placement decision.

The Bureau identified a need for the ADX to effectively manage inmates
who by the nature of the offense conduct, criminal history, and/or
discipline history while incarcerated pose a significant threat to the
safety of staff, inmates, and the public.  You are being considered
for ADX general population placement based on your blatant disregard
and continued misconduct and refusal to adhere to institution rules.
Specifically, on September 17, 2012, you received an incident report
for Participating in an Unauthorized Meeting.  On June 26, 2012, and
February 27, 2012, you received an incident report for Being in an
Unauthorized Area.  On November 3, 2011, you received an incident
report for Participating in an Unauthorized Meeting.  All four of
these disciplinary incident reports were the result of you engaging in
group or congregate prayer outside of the appointed multi-purpose room
and/or outside of a scheduled activity or program.  This behavior is
in direct violation of USP Marion's Institution Supplement,
MAR-5360.09, Religious Beliefs and Practices, dated June 8, 2012.
Additionally, records indicate you incurred your most recent incident
report on December 4, 2013, for Extorting/Blackmail/Protecting.
Further, a review of your discipline history revealed you incurred
incident reports for Possessing a Non-Hazardous Tool and Assaulting
without Serious Injury.

In regards to your allegation that a senate report was used against
you as a retaliatory means for your criticism of CMU staff and Bureau
staff in charge of ADX referrals is unsubstantiated.  Thus, there was
no violation of your procedural due process rights, as you believe.

Furthermore, you oppose the opinion that your conduct creates a risk
to institutional security and good order; precluding your placement in
general population at a regular correctional facility.

Administrative Remedy Number 780153-R1
Part B - Response
Page 2

On the contrary, a review of your instant offense, criminal history, incident report history, and investigative reports unequivocally prove otherwise. Therefore, your belief that the decision was retaliatory, illegal, and violates Bureau policy is counterfactual. The Bureau will retain the authority to select the place of your imprisonment.

Your conduct requires greater security and controls than can be afforded while you are housed in a typical general population setting or in a CMU. Your disciplinary history has shown a disregard for rules and regulations as you have repeatedly been found participating in group or congregate prayer outside of the appointed multi-purpose room and/or outside of a scheduled activity or program. Your refusal to adhere to institution rules demonstrates the fact you still pose a serious threat to institutional security, good order, and the safety of others.

A review of your records indicates you received Notice of Hearing on Referral for Transfer to the General Population at the ADX on April 7, 2014. The initial hearing was conducted on April 9, 2014, you appeared at the hearing via telephone and made an oral statement. Additionally, you submitted a 28-page handwritten statement. Your medical records were reviewed and determined to be appropriate for designation to the general population at the ADX. There is no evidence to support your claim that your consideration to the general population at the ADX was retaliatory or violates Bureau policy. The Hearing Administrator's findings and the Regional Director's recommendation were reviewed by the Designation and Sentence Computation Center, and the Assistant Director, Correctional Programs Division, Central Office. Accordingly, you were appropriately assigned to the ADX such that greater management of your interactions would ensure the safety, security, or orderly operation of Bureau facilities and protection of the public.

We concur with the decision and find your placement appropriate and consistent with the requirements of Program Statement 5100.08, Security Designation and Custody Classification Manual. You have not demonstrated otherwise. Your appeal is denied.

You have the right to appeal the BP-10 response within thirty days from the date on the BP-10 response using the Central Office Administrative Remedy Appeal (BP-11) form. Your appeal should be sent to Office of General Counsel, HOLC Building, 320 First Street, N.W., Washington, DC 20534.

5-29-2014
_____
Date

_____
Jose A. Santana, Chief
Designation and Sentence Computation Center

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

6/17/18:00

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Chesser, Zachary A.          76715-083          ADX Florence
　　　LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.          UNIT          INSTITUTION

**Part A - REASON FOR APPEAL** This appeal has been delayed by my transfer and lack of access to my property which has prevented me from obtaining an attachment.

First, this is appealed for every reason I have previously raised in this process.

Second, the region's response indicates that the main reason I have been placed in the highest security prison in the country is my frequent engagement in congregate prayer. To be frank, this is an absurd justification. There are hundreds of inmates who have been convicted of stabbings, life-altering beatings, burning people with boiling oil, rape, selling drugs and other far more serious (at least if we agree to be rational) offenses than praying. Honestly, I do not see how prayer harms security at all. I concede the point. This is an illegitimate reason to place me in ADX. Also, it is illegal as previously explained.

Third, the region ignored my main issue with the Senate Report, which was that I was not informed of it, nor given the chance to defend against it. That violates my procedural due process rights.

Fourth, similarly, the region claims investigative reports were used against me. I never saw these. I have no idea what they say. I was not informed of them until I received the regional response. Such also violates my procedural due process rights. Return me to a CMU or other less restrictive facility.

DATE _____                    SIGNATURE OF REQUESTER _____

**Part B - RESPONSE**

RECEIVED

JUN 3 0 2014

Administrative Remedy Office
Federal Bureau of Prisons

DATE _____

ORIGINAL: RETURN TO INMATE

GENERAL COUNSEL

CASE NUMBER: 801.53

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
　　　　LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION
SUBJECT: Response

DATE _____                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

Administrative Remedy No. 780153-A2
Part B - Response

This is in response to your Central Office Administrative Remedy
Appeal where you appeal your ADX/GP placement and transfer.  You
argue your placement is not justified and illegal.  You also
state you were not given the chance to defend against
documentation used to support this placement and allege due
process violations.  You request to be returned to a
Communication Management Unit or other less restrictive
facility.

The Regional Director adequately addressed the issues raised in
your appeal and we concur with the response provided.  Program
Statement 5100.08 Security Designation and Custody
Classification Manual provides policy and procedure regarding
the Bureau of Prisons (BOP) inmate classification system.  The
classification of inmates is necessary to place each inmate in
the most appropriate security level institution that also meets
their program needs and is consistent with the BOP's mission to
protect society.  The above policy provides procedures and
criteria for ADX referrals, hearings and transfers.  The BOP
designates inmates to an ADX when they have demonstrated an
inability to function in a less restrictive environment without
being a threat to others or the secure and orderly operation of
an institution.  This enhances the BOP's ability to manage some
of the most disruptive and problematic inmates in the system.

A review of records reveals you have engaged in activity and
conduct that creates a risk to institution security and good
order and poses a risk to the safety of staff, inmates or others
and to public safety.  You have also been identified as
participating in, organizing and/or facilitating any group
misconduct that adversely affected the orderly operation of the
institution.  Based on the above, you were referred for ADX
placement.  You received notice of the ADX referral hearing on
April 7, 2014.  You appeared in-person at the April 9, 2014,
hearing and provided oral and written statements on your behalf.
Full consideration was given to all documentation received and
you were made aware of the information being considered.  In
addition, you received a mental health assessment prior to the
hearing and it was determined you were capable of functioning
adequately in an ADX environment.  We concur with this decision
and find you meet eligibility criteria for ADX/GP placement.
You have been afforded the opportunity to appeal this placement
and there is no indication your due process rights were
violated.  Accordingly, your appeal is denied.

_August 13, 2014_                    _Mony Ghull_
Date                                 Acting Administrator
                                     National Inmate Appeals

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ZACHARY A. CHESSER,                    )
                                       )
         Plaintiff,                    )
                                       )
    v.                                 )   Case No.
                                       )
DIRECTOR, FEDERAL BUREAU OF            )
PRISONS,                               )
                                       )
         Defendant.                    )

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Zachary A. Chesser, *pro se*, hereby moves this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure to enter a temporary restraining order (TRO) and preliminary injunction enjoining the Defendant, the Director of the Federal Bureau of Prisons ("BOP"), from enforcing its policy restricting religious gatherings more than non-religious gatherings, on the following grounds:

## A. Introduction

Plaintiff Zachary A. Chesser is a Muslim prisoner in the BOP and he sincerely believes his religion, Islam, obligates and encourages a number of congregate religious activities such as five daily congregate prayers, various event-based prayers, religious classes and celebrations. The Director of the BOP only permits such activity once per week, despite allowing similar non-religious activity. This policy restricting religious gatherings has been rigorously enforced against Muslims like Mr. Chesser and even formed a sub-stantial part of the basis for his and other inmates' transfers to U.S. Penitentiary Florence. Colorado's Administrative Maximum Facility ("ADX"), the BOP's most secure and restrictive prison. The question in this case is whether this policy violates the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1.

I. *Chesser v. Walton, et al.*, No. 3:12-cv-01198-JPG-PMF (S.D. Ill.) ("*Chesser I*")

In *Chesser I*, the Plaintiff sued the Director and a number of others in a very similar case challenging a local implementation of the Director's policy

Page | 1

at U.S Penitentiary Marion, Illinois as it pertained to Islamic congregate prayer in the Communication Management Unit ("CMU"). It is very similar to another case in which the Director's policy was enjoined at the BOP's only other CMU at Federal Correctional Institution Terre Haute, Indiana ("FCI Terre Haute"). See Lindh v. Warden, No. 2:09-cv-215-JMS-HJD, 2013 U.S. Dist. LEXIS 4932 (S.D. Ind. Jan. 11, 2013). Mr. Chesser was pursuing a preliminary injunction against the Director and others when he was transferred to ADX. While the Court conceded his transfer was based on his violations of U.S. Penitentiary Marion's ("USP Marion") policy, the Court declined to address the issue, finding the original motion moot, and stating Mr. Chesser would need to file a new lawsuit to address his concerns. (Chesser I, Doc. 99, pp. 3-4). Hence, he filed this suit challenging the Director's entire policy.

At some future date, this Court may or may not accept testimony from Chesser I as evidence in this case. However, a motion for a temporary restraining order and preliminary injunction revolves around the *likelihood* of success. See Exell v. City of Chicago, 651 F.3d 684, 694 (7th Cir. 2011). Thus, the Court should assume that what was established in a similar case between the same plaintiff and same defendant will also be proven here in considering this motion

## B. Factual Background

A violation of RFRA occurs when (1) the sincere religious exercise of an individual is (2) substantially burdened by an agency of the United States, unless (3) the government demonstrates that the burden furthers a compelling governmental interest and is (4) the least restrictive means of furthering that interest. 42 U.S.C § 2000bb-1, et seq. Thus, it helps to discuss the facts in this context.

### I. Sincere Religious Exercise

Zachary Chesser is a Sunni Muslim who follows the Hanbali school of jurisprudence according to a methodology called "Salafism." He embraced Islam in the

summer of 2008 and began studying Islam under religious scholars and through books and various electronic recordings. He continues his studies to this day, having learned Arabic, Islam's liturgical language, and memorizing most of the Quran, Islam's holy book. (Decl. of Zachary Chesser, ¶¶ 1-5, attached as Exhibit A).[1]

All Muslims attach significance to making Islam's five daily prayers in congregation. (Decl., ¶¶ 23-24). This was conceded by the Director's expert witness, Ammar Amonette, in Chesser I (Hrg., pp. 135 ln. 19-136 ln. 4 and 138 ln. 18-20; the relevant pages of the transcript for the evidentiary hearing in Chesser I, Doc. 67, are attached as Exhibit B). As a Hanbali, Mr. Chesser believes missing one of these prayers in congregation is a sin for adult men. (Decl., ¶ 23). Amonette agreed this was the Hanbali position (Hrg., p. 137 ln. 10-19). Further, when the Court asked defense counsel, "Does the government contest that Mr. Chesser sincerely believes that five communal prayers daily are a central and necessary aspect of his faith?" Counsel responded, "We do not challenge his sincere religious beliefs." (Hrg., p. 24 ln. 19-23). In fact, Mr. Chesser continued to pray, despite severe sanctions for violating the Director's policy, until he was sent to ADX. (Decl., ¶ 26; and Exhibit C: Mr. Chesser's incident reports).

Islam also universally obligates the teaching and learning of its main tenets. (Decl., ¶ 6). It also obligates that some members of each community teach and learn the finer details of the religion. Id. Taking this information from books alone is considered insufficient, because the Quran and Hadith, Islam's other major collection of texts, explicitly obligate teaching and learning from people with religious knowledge and due to the problem of the tendency to misunderstand inanimate learning tools which gives rise to heretical understandings. (Id., ¶¶ 11-12). Finally, even when a person's situation is such that teaching or learning are only supererogatory, there is no

[1] It is a bit long-winded, but the Plaintiff encourages the court to review the entire declaration for relevant religious and situational background.

dispute that these remain recommended activities. (Id., ¶ 18). Mr. Chesser believes it is obligatory on him to teach and pursue the finer details in the BOP. (Id., ¶ 9).

Islam also universally obligates and/or encourages (depending on one's view) a number of event-based prayers in congregation such as the prayers on the Islamic holidays called "'Id," a funeral prayer and a rain prayer, gathering for Islamic remembrance, and a number of celebratory gatherings such as feasts for 'Id, weddings and the birth of a child. Mr. Chesser believes all of these hold a high status. (Decl., ¶¶ 13, 26 and 27).

## II. Substantial Burden

The BOP's Program Statement P5360.09 states, "Ordinarily the level of supervision of inmate religious groups in secure facilities will follow these guidelines for religious programs involving worship, study or meetings. Inmate-led religious programs require constant staff supervision.... Authorized congregate services will be made available for all inmates weekly with the exception of those detained in any Special Housing Unit (SHU)." This policy and a local adaptation, MAR-5360.09, were enforced in conjunction and are effectively one and the same as indicated by Inmate Mohammad Amawi's incident report (Exhibit D), Mr. Chesser's appeal of an incident report's response (Exhibit E), and the Director's affirmative defense that jurisdiction of Chesser I, was improper in the Southern District of Illinois because the policy he challenged was enforced nation-wide (Chesser I, Doc. 49, p. 13).

At USP Marion, Mr. Chesser was repeatedly ordered to stop praying with others. (Decl., ¶ 28). He was written four incident reports for praying in congregation, losing his e-mail privileges, his only way to correspond with his wife, for 240 days (Decl., ¶¶ 29-30; Ex. C & E). His cell was even moved on suspicion he was using its proximity to other Muslims to covertly pray in congregation. (Decl., ¶ 31). In late 2012, he filed a lawsuit challenging the local policy at USP Marion under RFRA. This was followed by

Page 14

increased attempts to catch him praying, then a lull which coincided with the timing

of the screening of his complaint (Decl., ¶32) and enjoinment of the same policy

at the other CMU in Lindh. He testified in Chesser I that he believed the lull was

the result of hesitation due to his suit or his praying "in sort of clandestine

fashion..." (Hrg., p. 48 ln. 12-20). However, when asked what would happen

if two inmates playing checkers decided to stop in order to pray together, the

Warden of USP Marion said it would be problematic "because it changes it from

an activity that is expected and allowed for, to an activity that we would want to

closely monitor." (Warden Depo., p. 25 ln 11-22; relevant pages of the Warden's deposition

are attached as Exhibit F). He further testified that, while Mr. Chesser was evading

detection, he prayed at his own risk. (Hrg., p. 78 ln 8-14; Warden Depo., p. 24 ln 4-11).

Despite all of this, the Director's counsel argued that the ban was not being

enforced and secured a recommendation from the Magistrate Judge to deny Mr.

Chesser's motion for preliminary injunction. (Chesser I, Doc. 68, pp. 6-7).

However, a few days after the November 19, 2013 hearing for his motion

Mr. Chesser was written an incident report for "extortion" and placed in the SHU.

He disputes this accusation. (see Decl., ¶36; Exhibits G & H: ADX Recommendation and

ADX Appeal). He was then informed he was being referred for transfer to ADX.

(Decl., ¶36). He later learned that his incident reports for group prayer were being

used to justify his transfer. At a hearing on April 7, 2014, an F. Frandle told him

his involvement in group prayer was one of three primary reasons he was going to

recommend Mr. Chesser's placement in ADX. (Decl., ¶37). Frandle included the prayer

in his report. (Ex. G, p. 9)[2] Mr. Chesser was then transferred to ADX on June 12, 2014.

(Decl., ¶37).

_____

[2] Frandle misrecorded virtually all of Chesser's oral statement, and this should be
obvious from simply reading it.

Mr. Chesser appealed to the Grand Prairie Designation and Sentence computation center on May 9, 2014. His appeal was about fifty pages long, of which only three addressed the issue of prayer. (Decl., ¶ 38; Ex. H, pp. 3-22). The BOP responded stating that Mr. Chesser's refusal to abide by the prohibition on religious gatherings justified his transfer, citing little else. (Decl., ¶ 38; Ex. H, pp. 1-2). Mr. Chesser appealed to the BOP's Central Office on all grounds in his prior appeal and a few more issues. (Decl., ¶ 39; Exhibit I: Central Office Appeal and Response). The Central Office responded on August 13, 2014. They cited no specific justification for Mr. Chesser's transfer except "group misconduct." (Ex. I, p. 2). This refers to the prayer, as is obvious from the lack of citation to any other "group misconduct" in other related documents. (Decl., ¶ 39).

Religious gatherings are virtually impossible at ADX and Mr. Chesser is too worried that he will be held longer in ADX if he tried to hold one in a rare moment of opportunity. He is held in extremely onerous conditions in indeterminate solitary confinement. (Decl., ¶ 40; See also Chesser I, Doc. 85, Ex. A, for a detailed description of ADX policy by a BOP employee). This totally disproves the argument of the Director's counsel in Chesser I that the ban was not enforced.[3]

Mr. Chesser was also prevented from holding classes due to the Director's policy except what was conducted in secret. (Decl., ¶ 41). Also, Inmate Kevin James, also a Muslim, was sent to ADX primarily for attending religious classes and partially for having once received an incident report for praying in a group

[3] The Court in Chesser I recognized this, although it still held his motion for a preliminary injunction was moot due to his transfer and said he needed to file a new suit and motion to address the policy beyond Marion. "While it is true that Chesser's transfer based on his failure to obey USP-Marion's prohibition on congregate prayer in the CMU may be evidence that the defendants, contrary to their representations earlier in this lawsuit, are enforcing that prohibition, it does not justify reinstating a preliminary injunction motion addressed to conditions Chesser no longer faces." Chesser I, Doc. 99, p. 3.

at the CMU at FCI Terre Haute. The BOP used this against him at USP Marion despite it having been declared illegal in Lindh. (Decl., ¶¶ 42-44).

Despite inmates being allowed to eat together non-religiously (Hrg., p. 41 ln. 19-25), inmates have been written incident reports for "congregate meals" when it was determined they had a religious intention. (Exhibit J: Incident Report of Mohamed Shnewer). This speaks to how incredibly broad the Director's policy is, as written.

## III. Compelling Governmental Interest

According to documents filed in Lindh, the Director implemented the policy restricting religious gatherings on December 31, 2004, following an Office of the Inspector General ("OIG") report claiming that religious gatherings needed to be supervised to prevent Muslim inmates from becoming radicalized. (Lindh, Doc. 70, pp. 24-29 or 18-23 of the proposed pleading). [4] This was echoed by the Warden's testimony in Chesser I, in which he stated his top three concerns in allowing group prayer for Muslims were: (1) terrorist proselytizing, (2) the possibility some inmates might be excluded, and (3) that other inmates would want their prayers accommodated. (Hrg., pp. 57 ln. 18-58 ln. 18).

However, Islamic prayers are rote and followed a scripted set of sayings and movements, most of which are silent. The movements involve standing, bowing, prostrating and sitting. (Decl., ¶¶ 10 and 20). Any outside speech or movements, proselytizing or passing notes would invalidate the prayers. (Decl., ¶ 15; Hrg., pp. 37 ln. 21-38 ln. 5, and 41 ln. 7-15). The Warden conceded the prayers were rote, posed no danger in and of themselves and only stipulated the concern that a prayer was actually occurring, as opposed to

[4] Mr. Chesser only has access to certain pleadings from Lindh, but the Director, by virtue of his position, should have access to Lindh and Chesser I.

other activity (Hrg., pp. 74 ln. 11-18 and 77 ln.1-7). Essentially, the Warden felt prayer should be banned to make sure activity other than the prayer was not going on.

The Warden, however, was unable to explain how a gathering for prayer made it any more ~~just~~ easy to proselytize or plan disturbances than other allowed activity such as checkers, which he said need not be supervised, and card games — admitting four Jihadists like Mr. Chesser could sit, play cards and converse with "a newbie who might be fertile ground for recruitment" — when questioned by the Court. (Hrg., pp. 89 ln.2 — 91 ln. 23). When Mr. Chesser was asked if he could play checkers with another inmate and discuss jihad, he testified he could. When asked what would happen if they stopped playing checkers and discussing jihad — and instead began praying together — Chesser testified, "No, they would not let us do that," explaining that communal prayer was only allowed on Friday from 1 p.m. to 3 p.m. (Hrg., p. 43 ln. 13-21).

As for his second concern, when asked, "[D]o you have anything concrete that would support your fear or belief... that [unsupervised Islamic congregate prayers] would not be inclusive?" The Warden replied, "No, sir," (Hrg., p. 95 ln. 19-25).

The Warden's third concern does not really apply here (or there), because Mr. Chesser is simply asking to not be punished, not to have religious gatherings accommodated. However, it is telling that during the Islamic holy month of Ramadan, group prayer, with mostly Jihadists, was permitted for thirty days each year with no direct supervision, no incidents and no need to hire more staff. (Hrg., pp. 44 ln. 2-11 and 85 ln. 24—86 ln. 1). Further, while his opinion contradicted the Warden's, Timothy Coleman, who oversaw the CMU at FCI Terre Haute before and after Lindh, testified that he never saw any problem with two Muslims

Page | 8

praying or even studying together, even before Lindh. (Hrg., p. 132 ln. 8-18).
Further, Coleman was unable to link any negative activity to the allowance of
group prayer with up to ten inmates at a time following Lindh, despite
trying to assert inmates had become "defiant." (Hrg., p. 123 ln 10-24).

  Perhaps, the most telling testimony of all, regarding this issue came
when the Plaintiff's counsel asked the Warden, regarding Mr. Chesser's clandestine prayers —
with Jihadists and non-Jihadists alike — "[H]ow many bad things have
resulted from the clandestine group prayer?" The Warden replied, "None that I am
aware of." (Hrg., p. 79 ln 6-8).

  Inmates can sit and discuss almost anything they want, but if they pull out
a Quran, Bible or Torah, it is forbidden. Two Muslims can study Latin or Hebrew,
but not Arabic. A Catholic can do the same with Arabic and Hebrew, but not Latin.
A Jew can meet to study Latin and Arabic, but not Hebrew. Two Muslims can eat
together for no reason, but they cannot eat together for a religious reason. Mr.
Chesser is free to promote terrorism in any number of ways, but were he to
pull out an Islamic book which spoke against it, he would be punished for holding
a class. (Decl., ¶¶ 48-49).

  In fact, the Director's policy promotes terrorism by prohibiting activities which
cannot be easily used to promote terrorism and allowing those which can. (Decl.,
¶¶ 45-49). Virtually all above-cited testimony supports this. Further, the very nature of
the ban causes it to be seen as an assault on Islam which serves to radicalize
prisoners and the public. (Exhibit K: Second Incident Report of Mohamad Shucref;
Decl., ¶¶ 50-51). The Director's witness, Ammar Amonette, even testified that
extremists would be willing to kill him, just because Mr. Chesser said his
testimony in Lindh was heretical in a series of articles he had posted online.
(Hrg., p. 136 ln. 17-25). Mr. Chesser was in no way, shape or form threaten-

ing Amonette, but his testimony does paint a picture of how the Director's policy is perceived.

## IV. Least Restrictive Means

This policy, with the exception of a brief window once per week, is absolute and unqualified, having no clear boundaries, offering near limitless application. There are no exceptions with regard to the gathering's nature, size, subject, or location. Even groups of two, which Coleman found harmless, are banned. Were two inmates to invent a religion in which they worshipped the BOP and made its Program Statement their moral compass, they could not meet to discuss the importance of obeying BOP rules and regulations.

Moreover, by sending Mr. Chesser to ADX Florence, the Director has chosen to enforce the prohibition on religious gatherings in the same manner as his efforts to prevent violent murderers who have killed in prison from continuing to commit homicide. Execution is the only more restrictive method of enforcement possible.

## C. Argument

I. A violation of RFRA exists when an agency of the United States substantially burdens the exercise of a prisoner's religion, unless the government demonstrates that the burden is the least restrictive means of furthering a compelling governmental interest.

RFRA, 42 U.S.C. § 2000bb-1, was specifically enacted "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C § 2000bb-1(b)(1). The statute reflects Congress' concern about the Supreme Court holdings in Employment Division v. Smith, 494 U.S. 872 (1990), and O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987),[5] both of which, in Congress' estimation, weakened traditional First Amendment protections. S. Rep. 103-111, 1993 U.S.C.C.A.N. 1892, 1893-

[5] It is worth noting that in O'Lone, in denying a violation of the First Amendment with

1901. RFRA therefore provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. § 2000bb-1(a). Subsection (b) states, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person ⬚ — (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Therefore, under RFRA, the plaintiff has the burden of showing that a challenged practice creates a substantial burden to a sincere religious exercise at which point the burden of persuasion shifts to the government to prove that the burden is necessitated by a compelling governmental interest and is the least restrictive means to meet it. See, e.g., Navajo Nation v. U.S. Forest Service, 535 F. 3d 1058, 1069 (9th Cir. 2008).[6]

   II. The Plaintiff's desire to engage in religious gathering is a sincere religious exercise

   RFRA states that "the term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title." 42 U.S.C. § 2000bb-2(4). The latter section, part of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, et seq., notes that "[T]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This requires that "[a] litigant's claimed beliefs 'must be sincere and the practices at issue must be of a religious nature.'" Kaemmerling v. Lappin, 553 F. 3d 669, 678 (D.C. Cir. 2008)(quoting Levitan v. Ashcroft, 281 F. 3d 1313, 1320 (D.C. Cir. 2002))[7][8]

   The gathering for religious classes, celebrations and prayers is obviously a religious

_____

regard to a prison's policy of denying Jumu'ah services to Muslims on work details, the Supreme Court noted that the ability of Muslim prisoners "to congregate for prayer or discussion is 'virtually unlimited except during work hours.'" Id., at 353.

[6] In Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court held RFRA did not apply to states; however, "[e]very appellate court that has squarely addressed the ⬚⬚ question has held that RFRA governs the activities of federal officers and agencies." O'Bryan v. Bureau of Prisons, 349 F. 3d 399, 401 (7th Cir. 2003).

[7] Originally, under RFRA "exercise of religion" was pinned to the First Amendment's

Preview Bd., 450 U.S. 707, 718 (1981)." Lindh.

A ban on a religious activity is by definition substantially burdensome. "We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise," and, therefore prohibiting the plaintiff "from attending religious worship services substantially burden[s] his ability to exercise his religion." Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir. 2008); see also, e.g., McKinley v. Maddox, — Fed. App'x —, No. 11-6263, 2012 WL 3292589, at *5 (10th Cir. Aug. 14, 2012)(refusal to permit inmate to attend church constituted a substantial burden). In Lindh, the Court found that insofar as it pertained to group prayer at FC Terre Haute's CMU, the Director's policy imposed a substantial burden. In Brown, the Court found that a less restrictive policy prohibiting religious gatherings of more than four substantially burdened the religious exercise of Muslims to make congregate prayers and hold classes.

While Mr. Chesser can perform a number of individual acts of worship, these do not qualify as substitutes for the encouraged and obligated congregate activity. Quoting Meyer v. Teslik, 411 F. Supp. 2d 983, 989 (W.D.Wis. 2006), the Lindh court found that "[T]he fact that Mr. Lindh is allowed to pray in his cell and to practice his Muslim faith in other ways within the CMU does not alter the fact that [T]his rights under RFRA are being violated by the Warden's failure to allow congregate prayer. '[P]laintiff's ability to practice his faith by means other than group prayer is irrelevant to the question whether his ability to freely exercise his beliefs was substantially burdened.' This is because, '[u]nlike the First Amendment, RLUIPA protects more than the right to practice one's faith; it protects the right to engage in specific, meaningful acts of religious expression in the absence of a compelling reason to limit expression.' This applies under RFRA as well. And, as the Meyer court noted in language apposite to this action, '[I]t is difficult to imagine a burden more substantial than banning an individual from engaging in a specific religious practice.'" (internal citations omitted) Lindh; see also Brown (the aforementioned less restrictive policy even violated the First Amendment because "Muslim inmates have no

alternate way to exercise their religious rights because communal worship and instruction are integral to the practice of their faith.").

The Director's policy defies the imagination of the Meyers court, as it imposes a ban on an entire category of religious exercise. Moreover, it is enforced in the harshest way possible by rendering it physically impossible. Execution is the only more burdensome method, but not by much. This is likely the most substantial restriction on religious exercise in modern American history. The policy encompasses the one which was enjoined by Lindh and is even broader and more restrictive than the one enjoined by Brown. Given the record and precedent, there is no doubt Mr. Chesser will be able to prevail on this issue as well.

**IV.** The Director's policy of restricting religious gatherings is not in furtherance of a compelling governmental interest.

As the Director's policy clearly places a substantial burden on Mr. Chesser's sincere religious exercise, it carries the burden of showing that the policy is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1(b); Navajo Nation, supra. The Director will not be able to establish either of these statutory requirements.

In Chesser I, the warden consistently argued the Director's policy — as applied at USP Marion — furthered security. There is no doubt that institutional security is "the most compelling governmental interest in a prison." Cichs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996). However, RFRA requires the Director to show that its policy actually furthers that interest. 42 U.S.C. § 2000bb-1(b). Although it is clear that courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources,'" this deference is not unlimited. Cutter, 544 U.S. at 723 (quoting S. Rep. No. 103-11, 1993 U.S.C.C.A.N. 1892, 1899, 1900). Therefore, "inadequately formulated prison regulations grounded on mere speculation, exaggerated fears, or post-hoc

rationalization will not suffice to negate the act's requirements." Sen. R. No. 103-11, 1993 U.S.C.C.A.N. at 1900. RFRA requires that the Director "must do more than merely assert a security concern." Murphy v. Missouri Dept. of Corrections, 372 F. 3d 979, 988 (8th Cir. 2004).

There are two issues here which negate the existence of a compelling governmental interest: (1) its inherent nature and (2) the factual evidence.

As for the former, the Director bans religious gatherings to the exclusion of non-religious gatherings. Two inmates can eat together so long as their purpose is not religious, for example. Further, this justification is the fear of the spread of a "radical" system of belief. As a matter of law, these can never be used to justify or be incorporated in governmental interests. Religion, beliefs and ideologies — even "radical" ones — are outside the domain of government. There is a distinction between an act and a belief, and the latter, at least in a free society, can never threaten security or any other governmental interest, compelling or otherwise. While this case involves the easier standard of RFRA, the Constitution of the United States, being the foremost authority on the subject, is helpful in defining what can be considered a "governmental interest" to begin with.

The effort of the Director to move religion itself under the umbrella of "security" does not turn it into a governmental interest. See, e.g., Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972) ("But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). If a policy is not neutral, it does not fulfill the "legitimate interest" standard of Turner v. Safley, 482 U.S. 78, 89 (1987). Policies must even be more than "facially neutral." See Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 534 (1993) ("the Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination"); see also McAlister v. Livingston, 348 F. App'x 923, 937 (5th Cir. 2009); see also Mayfield v. Tex. Dep't of Crim. Justice, 529 F.3d 599, 607 (5th Cir. 2008) ("we have found it important to inquire whether prison regulations restricting an inmates' First Amendment rights operated

ated in a neutral ~~manner~~ fashion"). The Director's policy is not even facially neutral. It explicitly targets religion. Further, his motivation is similarly non-neutral as it targets a specific sect of Islam, albeit one most Americans find distasteful. The essence of the Establishment Clause is that "every denomination ..... be equally at liberty to exercise and propagate its beliefs." Larson v. Valente, 456 U.S. 228, 245(1982). This includes Jihadists. Basically, the Director erred in failing to distinguish between beliefs and acts, between Jihadism and jihad. The Brown court, ruling that the aforementioned less burdensome policy violated the First Amendment and was not rationally related to a legitimate governmental interest, said, "To require direct supervision of inmates congregating to pray while showing less concern for secular activities constitutes a form of 'content' discrimination that the First Amendment condemns and prohibits." (citing Mosley, supra).

Further, even if the reality of the Director's concern is security, the fact that it does not further security at all and most likely harms it is proof that no compelling governmental interest exists. The Warden testified that no incident had ever occurred as a result of congregate prayer, whether secret or public, supervised or not. Further, he was unable to link his concerns to group prayer in any way which is not more prevalent in permitted settings. There is also evidence that the ban causes radicalization. Aronette theorized extremists might kill someone over it. It also prohibits activity which is not convenient for proselytizing. Finally, it bans religious instruction which would improve security. In Lindh, the court found that evidence of group prayer's having caused no serious incident in six years negated any compelling interest in the Director's policy. That case dealt with a conit full of Jihadists as did the warden's testimony. If no security threat existed in these laboratories, it does not exist at all.

In Brown, the Court found that thirty-five years of unsupervised Islamic classes and prayers never resulted in an incident at all, that almost every prison

system in America had a policy of "indirect supervision" of religious gatherings, that requiring supervision increased costs not decreased them, and that religious gatherings reduced recidivism and improved safety and security in ruling that requiring direct supervision of religious gatherings did not only not serve any compelling or legitimate interest, but actually harmed compelling interests. See also Lee v. Gurney, 2009 WL 3109850 at *6 (E.D. Va. Sept. 25, 2009) (ten years of religious gatherings with no known subversive activities in Virginia prisons evidence of lack of compelling interest in banning them).

The record bears out that no compelling governmental interest exists. The Cindy court literally found this as applied to the Director's policy, enjoining part of it under RFRA. The Brown court enjoined a similar policy under the First Amendment, finding no legitimate governmental interest and RLUIPA, finding no compelling governmental interest. It is more than likely Mr. Chesser will succeed on the merits when two courts have already enjoined this type of policy and he has evidence such as this.

V. Even if the Director's policy restricting religious gatherings furthers a compelling governmental interest, it is not the least restrictive means to do so.

Even if the Director satisfies the burden of proving the policy furthers a compelling governmental interest, he must show it is the least restrictive means of furtherance. 42 U.S.C. § 2000bb-1(b)(2). In order to do this, "'the Government must consider and reject other means before it can conclude that the policy chosen is the least restrictive means.'" Williams v. Secretary Pennsylvania Dept of Corrections, 450 Fed. Appx 191, 195 (3d Cir. 2011) (quoting Washington v. Klem, 497 F. 3d 272, 277 (3d Cir. 2007)); see also, e.g., Shakur v. Schirro, 514 F. 3d 873, 890 (9th Cir. 2008).

While the Warden in Chesser I claimed without specification to have considered alternatives, having rejected even allowing two inmates to gather, he was contradicted by Timothy Coleman who not only considered a less restrictive policy, but claims to have

Page 17

implemented it (this apparently contradicts factual findings in <u>Lindh</u>). In <u>Chesser I</u>, the Director and other defendants failed to offer any proof that the policy was the least restrictive means and their own witness offered proof against it. Further, the fact that the Director's policy is absolute and has been enforced in the most severe way possible makes it the *most* restrictive means (if there is a compelling governmental interest). While possible, the most restrictive means usually is not the least restrictive means. Probability weighs in favor of the Plaintiff. Further, the use of the policy to detain inmates in ADX defies reason. It is highly unlikely the Director can justify that practice.

There is no burden on the Plaintiff, but there are many alternatives such as making inmates record religious gatherings on tape recorders, hold them in view of a camera, only teach approved literature, or segregating Jihadists in a separate prison, limiting group sizes, rotating service leaders, etc. Most of these probably also violate RFRA, but the violation would be less obvious than current policy. It is more likely the Director has no non-frivolous argument on this issue than not. Mr. Chesser is likely to prevail on this as well.

## VI. A temporary restraining order and preliminary injunction are justified

The grounds for granting a TRO or preliminary injunction are essentially the same. In order to be entitled to a preliminary injunction (or TRO), a plaintiff must show that they (1) have some likelihood of success, (2) have no adequate remedy at law and (3) will suffer irreparable harm if the injunction is not granted. <u>Ezell v. City of Chicago</u>, 651 F. 3d 684, 694 (7th Cir. 2011). Further, the court must also consider the public interest, weighing factors in a sliding scale approach. <u>Christian Legal Society v. Walker</u>, 453 F.3d 853, 859 (7th Cir. 2006). Also, as this pertains to prison conditions, such relief must extend "no further than necessary to correct the violation of the Federal right." Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, et seq.

As preceded, Mr. Chesser obviously has a likelihood of success. Further, he has no adequate remedy at law such as compensation through damages and "irreparable harm accompanies a substantial burden on an individual's right[] to the free exercise of religion..." Hammel v. Donahue, 2008 WL 2518268, at *6 (S.D. Ind. 2008) (quoting Jolly v. Coughlin, 76 F. 3d 468, 482 (2d Cir. 1996)) (enjoining Indiana Dept of Corrections ban on Odinist group prayer under RLUIPA). This burden as well as Mr. Chesser's confinement in ADX each constitute irreparable harms. The PLRA does not prevent that an injunction should impact the public. See Brown v. Plata, — U.S. —, 131 S. Ct. 1910, 1941 (2011). However, "Injunctions protecting First Amendment freedoms are always in the public interest." Christian Legal Soc'y, at 884. There is no reason to treat RFRA any different. The public has families and friends in prison, may one day enter prison themselves (presumably not all of them) and would benefit from the moral rectification of its delinquents. No harm is imaginable. The harm to the plaintiff and thousands of prisoners like him is tremendous. The Director should have no trouble accounting for security as it did in the century preceding the policy. In fact, security should improve. Further, costs will go down by not requiring direct supervision of religious gatherings.

The attached order proposed by Mr. Chesser is narrowly tailored to address only the apparent violations of law. While it enjoins the Director's policy in its entirety, this is necessary to restore the Federal right. Mr. Chesser does not propose to limit the Director's ability to address actual threats to security. It can still stop a religious gathering being used subversively, just not because it is religious. Further, he leaves the Director the option of negotiating terms which keep Mr. Chesser in ADX, but which allow him to exercise his religion. Mr. Chesser believes his interests and the Director's overlap on certain issues which may make this feasible.

## D. Security and Notification

As indicated by his Motion for Leave to Proceed Without Prepaying Costs,

Mr. Chesser can only afford a nominal security. Also, this injunction cannot cost the Director anything. Thus, it makes little sense to impose a security here.

Also, in addition to a near-identical effort at obtaining a preliminary injunction against the Director which was only mooted by Mr. Chesser's transfer, Mr. Chesser notified the Director of his intent to file for a preliminary injunction and TRO via mail on November 4, 2013. (Decle, ¶52).

E. Conclusion

It being likely that Mr. Chesser will prove a violation of RFRA has taken place, that he has no adequate remedy at law, that he is suffering irreparable harm to his religious exercise and quality of life, that enjoining the Defendant's policy restricting religious gatherings serves the public interest and the balance of harm in doing so clearly favors it, this Court should GRANT the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and ORDER the Defendant to cease applying greater restrictions to religious gatherings than non-religious gatherings, to cease retroactive enforcement of the policy, to transfer Zachary A. Chesser to a CMU or less restrictive facility consistent with his custody score or negotiate terms by which he will stay in ADX which accomodate his religious exercise within 48 hours of this Order, and to notify the inmate population of the Order via the electronic bulletin board.

RESPECTFULLY SUBMITTED,

Zachary A. Chesser, in esc
Reg. No. 76715-083
U.S. Penitentiary, ADX
P.O. Box 8500
Florence, CO 81226-8500

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ZACHARY A. CHESSER,                    )
                                       )
    Plaintiff,                         )
                                       )
        v.                             )    Case No.
                                       )
DIRECTOR, FEDERAL BUREAU OF            )
PRISONS,                               )
                                       )
    Defendant.                         )

ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION AND
TEMPORARY RESTRAINING ORDER

Upon the complaint, the motion, the supporting declaration and exhibits submitted herewith, it is:

ORDERED that Defendant Director of the Federal Bureau of Prisons show cause in room _____ of the United States Courthouse for the District of Columbia, 333 Constitution Avenue, N.W., Washington, D.C. 20001, on the _____ day of _____, 20 ___, at ____ o'clock, why a preliminary injunction should not issue pursuant to Rule 65(a) of the Federal Rules of Civil Procedure enjoining the Defendant, its successors in office, agents, employees and all other persons acting in concert and participation with them from enforcing any restrictions on religious gatherings not also currently applicable to non-religious gatherings in any way, including continuing to hold Zachary A. Chesser in U.S. Penitentiary Florence, Colorado's Administrative Maximum Security Facility ("ADX").

IT IS FURTHER ORDERED that effective immediately, and pending the hearing of this order to show cause, the Defendant, Director of the Federal Bureau of Prisons, its successors in office, agents, employees and all other persons acting in concert and participation with them are restrained from enforcing any restrictions on religious gatherings not also currently applicable to non-religious

gatherings in any way and from holding Zachary A. Chesser in ADX or any other facility more restrictive than a Communication Managament Unit or what his custody scoring traditionally merits, unless within 48 hours of the issuance of this order, the Director and Chesser agree to terms which accomadate his religious exercise at ADX.

Dated:
United States District Judge